THOMAS E. GIBBS (CA BAR NO. 93819)
VINCENT M. COSCINO (CA BAR NO. 122086)
BRIAN R. BAUER (CA BAR NO. 238368)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
1900 Main Street, Fifth Floor
Irvine, California 92614-7321
Phone:  (949) 553-1313
Fax:  (949) 553-8354

E-FILED ON JULY 26, 2011

AMY N. TIRRE (BAR NO. 6523)
LAW OFFICES OF AMY N. TIRRE, A
PROFESSIONAL CORPORATION
3715 LAKESIDE DRIVE, SUITE A
RENO, NV  89509
(775) 828-0909 TELEPHONE
(775) 828-0914 FACSIMILE

Attorneys for Debtors and Plaintiffs
CLEAR CREEK RANCH II, LLC, a Nevada limited
liability company; CLEAR CREEK AT TAHOE,
LLC, a Nevada limited liability company

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CLEAR CREEK RANCH II, LLC, a Nevada limited liability company,<br><br>      Debtor.<br><br>CLEAR CREEK RANCH II, LLC, a Nevada limited liability company; CLEAR CREEK AT TAHOE, LLC, a Nevada limited liability company,<br><br>      Plaintiffs,<br><br>      v.<br><br>NEVADA FRIENDS, LLC, a Nevada limited liability company; JOHN SERPA, SR., an individual; KEITH SERPA, an individual; JOHN SERPA, JR., an individual; SIERRA CLOUDS, LLC, a Nevada limited liability company; NORTHERN NEVADA TITLE COMPANY, a Nevada corporation,<br><br>      Defendants. | Case No. BK-N-11-52302-BTB<br>Chapter 11<br><br>Adv. No.<br><br>**DEBTORS' COMPLAINT FOR:**<br>**(1)   AVOIDANCE OF TRUST DEED (11 U.S.C. §§ 544, 550, 551);**<br>**(2)   DECLARATORY RELIEF;**<br>**(3)   BREACH OF FIDUCIARY DUTY;**<br>**(4)   FRAUD;**<br>**(5)   EQUITABLE SUBORDINATION (11 U.S.C. § 510(C));**<br>**(6)   CONSTRUCTIVE TRUST;**<br>**(7)   BREACH OF CONTRACT AND THE GOOD FAITH COVENANT;**<br>**(8)   TORTIOUS BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING; AND**<br>**(9)   CIVIL CONSPIRACY**<br><br>**[JURY DEMANDED]** |

1    Plaintiffs, debtors and debtors in possession Clear Creek Ranch II, LLC, ("CCR II")

2    and Clear Creek at Tahoe, LLC ("CCT") (collectively, "Plaintiffs") allege as follows:

3    **JURY DEMAND.**

4    1.    Plaintiffs request a trial by jury for all causes of action so triable.

5    **JURISDICTION AND VENUE.**

6    2.    This adversary proceeding arises under the above-captioned chapter 11 case

7    entitled, In re Clear Creek Ranch II, LLC, a Nevada limited liability company, Case No.

8    11-52302-BTB, and the related chapter 11 case entitled, In re Clear Creek at Tahoe, LLC, a

9    Nevada limited liability company, Case No. 11-52303-BTB, both of which are pending

10   before the United Bankruptcy Court, District of Nevada.  This Court has jurisdiction over

11   all claims asserted by Plaintiffs herein pursuant to 28 U.S.C. §§ 151, 157 and 1334 and 11

12   U.S.C. §§ 510, 544, 550 and 551.  This is a "core proceeding" pursuant to 28 U.S.C.

13   § 157(b) as to all claims asserted by Plaintiffs which arise under Title 11 or in Plaintiffs'

14   bankruptcy cases.  As to all claims for relief which are determined to be non-core, Plaintiffs

15   do not consent to the entry of final orders or judgments by the bankruptcy judge and

16   demand that such matters be tried by jury.

17   3.    Venue of this action properly lies in this Court pursuant to 28 U.S.C. § 1409

18   as CCR II's and CCT's bankruptcy cases, to which this matter relates, are pending in this

19   district.  Moreover, most of the acts and omissions which are the subject of this complaint

20   occurred in the State of Nevada.

21   **OVERVIEW.**

22   4.    CCR II is the owner of a 530.74 acre undeveloped residential subdivision

23   located within the project known as Clear Creek.  That project included a world-class golf

24   course, the residential subdivision around the golf course, a lake house on Lake Tahoe and

25   a fly fishing ranch along the West Walker River (the "Project").  The co-developers and

26   joint venturers of the Project are CCT and the Serpas (as defined below) acting through

27   CCR II and other developer entities.  Those co-developers agreed to work together for the

28   Project's success.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

933929.01/OC

5.    At the Serpas' request, for tax purposes, their joint venture interests in CCR II and the other development entities were put in the form of a promissory note and trust deed. The terms of the promissory note supplemented by the parties' "gentlemen's agreement" establish the joint venture, including the following terms:  (1) sharing of profits (after return of capital contributions) – 60% to the Serpas and 40% to CCT; (2) required capital contributions and sharing of losses – 60% to the Serpas and 40% to CCT; and (3) joint participation and control.  As such, under Nevada law, the rights and liabilities of the Serpas and CCT as relating to CCR II are to be determined in furtherance and in harmony with their joint purpose, as joint venturers, which is a relationship carrying both contractual and fiduciary duties.

6.    The Serpas breached their contractual and fiduciary duties by among other things (1) failing and refusing to fund their 60% share of capital contributions; (2) failing and refusing to cooperate as needed to address financial problems due to the recession; and (3) surreptitiously purchasing, through stealth and fraud, a $15 million loan secured by the residential subdivision (known as the First Horizon loan), and then attempting to foreclose on that loan necessitating the present bankruptcy.  By this adversary proceeding, Plaintiffs seek redress for the Serpas' wrongful conduct, including that the First Horizon loan be deemed a capital contribution by the Serpas and be equitably subordinated to Plaintiffs' interests, and that Plaintiffs be awarded actual and punitive damages according to proof.

**<u>THE PARTIES</u>**.

7.    Plaintiff and Debtor CCR II is a limited liability company organized under the laws of the State of Nevada.  CCR II is the debtor and debtor in possession of the above referenced chapter 11 bankruptcy, Case No. 11-52302-BTB.

8.    Plaintiff and Debtor CCT is a limited liability company organized under the laws of the State of Nevada.  CCT is the debtor and debtor in possession in the chapter 11 bankruptcy case of In Re Clear Creek at Tahoe, Case No. 11-52303-BTB.

9.    Defendant Nevada Friends, LLC ("Friends") is a Nevada limited liability company.

10. Defendants John Serpa, Sr. ("Serpa Sr.") and his sons Keith Serpa and John Serpa, Jr. are residents of the State of Nevada. These individuals, either directly or through affiliates, own and control Friends. Serpa Sr., his sons and Friends are sometimes collectively referred to herein as the "Serpas."

11. Defendant Sierra Clouds, LLC is a Nevada limited liability company. Plaintiffs allege on information and belief that Sierra Clouds is owned and/or controlled by the Serpas.

12. Plaintiffs allege on information and belief that at all times mentioned herein that Serpa Sr., Keith Serpa, John Serpa Jr., Friends and Sierra Clouds (the "Serpa Defendants") were and now are partners, agents, servants, employees, alter-egos and/or representatives of each other, and in doing the things hereinafter alleged were acting, or ostensibly acting, within the scope of their authority as such partners, agents, servants, employees, alter-egos and/or representatives with the actual or ostensible permission and consent of the others.

13. Defendant Northern Nevada Title Company ("NNTC") is a Nevada corporation. NNTC is named as a defendant solely in its capacity as a trustee under the deed of trust securing the First Horizon loan. Plaintiffs do not seek any damages from NNTC.

**FACTUAL ALLEGATIONS.**

**A.    Pre-Joint Venture Formation.**

14. The Clear Creek property (the "Property"), commonly known as Clear Creek Ranch, is located in Nevada, not far from Lake Tahoe. On information and belief, DGD Development ("DGD"), a Serpa entity, acquired the Property in stages between 2000 and 2003, and obtained entitlements to develop a golf course and residential community thereon. Chip Hanly ("Hanly") was involved in that process.

15. DGD borrowed $15 million from First Horizon Home Loan Corporation ("First Horizon") secured by the Property and personally guaranteed by Serpa Sr. and his son, John Serpa, Jr. (the "First Horizon Loan"). The proceeds of the loan purportedly were used to, among other things, construct the underpass on Highway 50 for access to the

1  Property, and purchase certain development and water rights.  On information and belief,

2  DGD subsequently formed Clear Creek Ranch, LLC ("CCR"), which it solely owned and to

3  which DGD transferred title to the Property.

4       16.    For the development of the Project, the Serpas decided to pursue an

5  experienced joint venture partner, including Discovery Land Company ("Discovery"), a

6  successful developer of resort/residential-type projects.  In 2006, Hanly contacted James S.

7  Taylor ("Taylor"), an experienced real estate investor and developer in Santa Barbara who

8  had a relationship with Discovery.  Thereafter, Taylor, Hanly and the Serpas engaged in

9  discussions with Discovery and another potential joint venturer named William Foley.

10  Those negotiations involved the Serpas joint venturing the development of the Clear Creek

11  Project.  However, Discovery and William Foley decided not to proceed.

12  **B.    The Creation Of The Joint Venture In The Form Of CCR.**

13       **1.    The Parties Agree To Joint Venture The Development Of The Clear**

14            **Creek Project.**

15       17.    After Discovery and Foley declined to proceed, Serpa Sr. suggested that the

16  Project proceed with the Serpas, Taylor and Hanly.  Taylor and Hanly were interested, and

17  discussions ensued.  In those discussions, the parties agreed that CCT (formed by Taylor,

18  Hanly and their investors) would jointly develop the Project with the Serpas on the

19  following principal terms:

20       a.    **Capital Contributions.**  The parties agreed that the Serpas would contribute

21  the Property with a deemed value of $80 million and CCT would contribute $15 million

22  cash, which immediately would be paid to the Serpas, reducing their deemed capital

23  contribution to $65 million.

24       b.    **Sharing Of Profits**.  The parties agreed that income from the Project would

25  be paid in the following order:  (1) payment of creditors and third-party loans; (2) repay-

26  ment of post-formation capital contributions or loans made by the parties, with a 10%

27  preferred return; (3) repayment of the initial $15 million capital contribution made by the

28  CCT, with a 10% preferred return; (4) payment of the Serpas' deemed $65 million capital

1    contribution with a 5% preferred return; and (5) sharing of profits at 60% to the Serpas and

2    40% to CCT until the Serpas receive $85 million in profits, and thereafter one-third to the

3    Serpas, and two-thirds to CCT.

4         c.     **Additional Capital Contributions/Sharing Of Losses.** The parties agreed

5    to contribute all additional needed capital, including to cover losses, on the same 60/40

6    basis they were sharing profits, i.e., Serpas – 60%; CCT – 40%. Based on Serpa Sr.'s

7    statements and his businesses and properties, Taylor and Hanly believed that the Serpas

8    could and would pay their 60% share of any needed capital contributions.

9         d.     **Allocation Of Responsibilities And Control.** The parties agreed that CCT,

10    through its principals, Taylor and Hanly, would take the laboring oar in designing,

11    developing and marketing the golf course, the subdivision, and the additional amenities.

12    Among other things, the Serpas agreed to (1) obtain approximately $65 million in

13    construction financing from First Horizon (with whom the Serpas represented they had an

14    existing and strong relationship and who hopefully would not have a problem with the

15    Serpas' tax structure described below) or another lender; (2) provide a personal guaranty

16    for the construction loan if needed; and (3) otherwise assist CCT as needed for the

17    development of the Project. The parties further agreed that while CCT, through Taylor and

18    Hanly, would manage the day-to-day affairs of the Project, the Serpas would provide input

19    and be given oversight and control including the right to approve the business plan and pro

20    forma for the Project.

21        **2.     The Form Of The Joint Venture As Requested By Serpa For Tax**

22            **Purposes.**

23        18.     Profits from a joint venture or partnership engaged in an active business

24    generally are taxed as ordinary income. Accordingly, if the Clear Creek venture was

25    documented using a standard form joint venture or partnership agreement, the Serpas' 60%

26    share of any gain realized from the joint venture or partnership likely would be taxed as

27    ordinary income. However, the Serpas developed a tax-saving structure that they believed

28    would allow them to avoid ordinary income tax treatment; specifically that the Serpas' joint

1  venture interest be held in the form of a promissory note secured by a trust deed,

2  purportedly given for the sale of the Property.  Payments under such a promissory note

3  arguably could be treated as capital gains at a significantly lower tax rate.  Thus, under the

4  Serpas' tax structure, the Serpas' share of joint venture profit, paid in the form of payments

5  on a promissory note, could receive favorable capital gains treatment.

6      19.    For the Serpas' tax plan to succeed, the note and trust deed needed to look

7  standard on their face as much as possible.  Doing so meant that these documents would

8  include terms not applicable to this venture and exclude important terms that are applicable.

9  This would be dealt with by what the parties referred to as a "gentlemen's agreement."  In

10  reliance on the gentlemen's agreement and their belief that they could trust Serpa, Taylor

11  and Hanly agreed to accommodate the Serpas' requested tax structure.

12      **3.    <u>The Form Chosen By The Parties</u>.**

13      20.    To implement the Serpas' tax plan, the parties chose to use CCR as the form

14  for the joint venture.  Thus, the parties agreed that CCR would continue to hold title to the

15  Property, that CCR would develop the Property, that all needed capital contributions

16  effectively would be made to CCR, and the income from CCR would be used to repay

17  capital contributions and pay profits to CCT and the Serpas.

18      21.    The parties structured the venture as a sale of the Serpas' 100% ownership

19  interest in CCR to CCT for which the Serpas would receive a $150 million promissory

20  note.  In March 2007, DGD transferred its ownership interest of CCR to Friends, another

21  Serpa entity, which became the seller entity in the Serpas' tax structure.  After the sale, the

22  two venturers, CCT and the Serpas through Friends, would hold their joint venture interests

23  in CCR as follows:  CCT by direct ownership and the Serpas through indirect ownership in

24  the form of the promissory note.

25      22.    Counsel for the parties then prepared the documents to implement this form,

26  including:  (1) a written purchase agreement for the sale of Friends' interest in CCR to CCT

27  for a purchase price of $165 million; $15 million cash payment and a $150 million promis-

28

sory note[1]; (2) the $150 million promissory note (the "Friends Note") which will be discussed below; and (3) a trust deed purportedly to secure the Friends Note (the "Friends Trust Deed") which was given to provide further appearance of bona fides to the Serpas' tax structure.  These documents were signed and the joint venture effectively commenced in late May 2007.

**4.    The CCR Joint Venture Is Reflected In The Friends Note.**

23.    While the Friends Note was designed to look like a promissory note, several of its key terms manifest the joint venture in the form of CCR, including:

a.    **Payment Terms – Sharing Profits**.  The Friends Note does not call for principal and interest payments per se, but rather for payments only from <u>CCR's income</u> in a manner entirely consistent with a joint venture.  Specifically, Section 2.04 of the Friends Note calls for payments from income generated by CCR as follows:

(1)    first, to "repay any construction or other third-party loans obtained by [CCR] and to pay all costs and expenses of [CCR] incurred in connection with the Project";

(2)    then to CCT to "repay the principal balance owing under any loans and/or any unreturned capital contributions made by [CCT] (or any affiliate thereof) to [CCR], together with interest on such loans and/or contributions calculated at the rate of ten percent (10%) per annum, compounded annually" (i.e., a 10% preferred return);

(3)    then to CCT to repay its $15 million initial capital contribution, plus a 10% preferred return;

(4)    then to Friends to pay the Serpas' deemed $65 million capital contribution for contributing the land, plus a 5% preferred return; and

---

[1]    The $165 million purchase price confirms that this structure is for tax purposes; that so-called purchase price is far in excess of the value of the Property, and was arrived at to give the Serpas their return on their capital contribution plus <u>$85 million</u> in hoped for profits from the venture.

1    (5)    thereafter, CCR's profits are shared 60% to Friends and 40% to CCT

2    until Friends receives $85 million.

3  Thus, the payment terms under the Friends Note do not reflect standard payment terms

4  under a promissory note, calling for periodic principal and interest payments.  Rather, they

5  reflect the standard payment terms under a joint venture or partnership agreement – with

6  venture income being paid first to third-party creditors, second to return of CCT's capital

7  with preferred return, third to the Serpas' return of capital with preferred return, and fourth

8  to sharing of profits.  Moreover, unlike a standard promissory note, the purported lender

9  (Friends) under the Friends Note subordinated its right to receive payments to the purported

10  borrower's (CCT) return of capital and payment of profit.  Simply put, an ordinary lender

11  would not subordinate its right to receive payment under a note to the borrower's return of

12  capital and sharing of profits.

13    b.    **Control**.  The parties' agreement to jointly develop and control CCR and

14  thus the Project is reflected in the Friends Note in two places.  The first is in Section 6.07,

15  which obligates CCT to provide Friends with monthly and quarterly financial reports, tax

16  returns and access to "full and accurate books and accounts" for CCR.  The second is in the

17  "Executive Business Summary" attached as Schedule 1 to the Friends Note which outlines

18  CCR's plans and provides important financial and other information regarding the Project,

19  including a pro forma which incorporates those plans.  The Summary states:  "The Pro-

20  forma shall be modified after the detailed analysis is completed and thereafter from time to

21  time by [CCT] to reflect changes in market conditions or other events outside the control

22  of [CCT] and submitted to [Friends] for its approval, which shall not be unreasonably

23  withheld, conditioned or delayed."  These broad approval rights gave the Serpas a

24  substantial degree of control over CCR and thus the Project, again manifesting the parties'

25  joint venture in the form of CCR.

26    c.    **Anti-Assignment Clause**.  Section 6.08 of the Friends Note contains a broad

27  anti-assignment clause, which reads:

28

"6.08  <u>Restrictions on Transfers</u>.  Neither Borrower nor Lender shall have the right to assign, transfer or encumber this Note or any rights, benefits, duties or obligations hereunder without the prior written consent of the other party, which consent may be withheld in the <u>sole and absolute</u> discretion of such other partner."

This anti-assignment clause also manifests that the Serpas' joint venture interest in CCR was given in the form of the Friends Note.  A standard promissory note allows the lender to sell or assign the note to third parties; lenders would not agree to a restriction on that right, particularly one giving the borrower the right to veto the transfer of the debt in the borrower's "sole and absolute discretion."  On the other hand, joint venture and partnership agreements typically prohibit a venturer from selling his or her interest without the other venturer's consent, which can be withheld in their "sole and absolute discretion."  The reason for such a restriction is that venturers enter into joint ventures with people they know and trust, and do not want new venturers they neither know nor trust foisted upon them.  Section 6.08 was included in the Friends Note for precisely that purpose.

**5.     <u>Other Terms Of The Joint Venture Are Reflected In The Gentlemen's Agreement</u>.**

24.     Because the Serpas put their joint venture interest in the form of the Friends Note and Friends Trust Deed for tax purposes, many important terms were not included in those "form" documents.  As a result, from the beginning, CCT and the Serpas were required to trust each other by relying on side agreements, some oral and others understood, which they euphemistically called the "gentlemen's agreement."

a.     <u>**Future Capital Contributions – Sharing Of Losses**</u>.  As part of the gentle-men's agreement, the parties agreed that the Serpas would fund 60% and CCT would fund 40% of all needed capital contributions, which sharing matches their 60/40 split of profits.  Serpa Sr. expressly acknowledged this agreement in his notes of a July 31, 2008 meeting, which state:  "Friends pays sixty cents of every dollar spent on C. Creek."  This promise

1   renders the Serpas responsible for 60% of the capital and losses for the Project, another

2   element of the joint venture.

3       b.    **Additional Profit Split**.  The Friends Note provides that profits are to be

4   split 60/40 until the remaining $85 million balance under the note is paid, which equates to

5   a profit pay out to the partners of approximately $142 million.  As part of the gentlemen's

6   agreement, the parties agreed to split any profits above that amount:  one-third to the

7   Serpas and two-thirds to CCT.

8       c.    **Participation And Control**.  As alleged above, the parties agreed on their

9   respective work responsibilities for the project.  While CCT through its principals Taylor

10  and Hanly would handle day-to-day management responsibilities, the Serpas would exer-

11  cise reasonable control.  In addition, the parties understood that CCT would keep the

12  Serpas informed of all important developments, and obtain their input and consent to major

13  decisions.

14      d.    **Friends Trust Deed Not To Be Recorded**.  It was understood and agreed

15  that the Serpas would not record the Friends Trust Deed for two important reasons.  First,

16  the Serpa Trust Deed was given for the tax structure requested by the Serpas.  Second,

17  recording the $150 million Friends Trust Deed would be detrimental to the Project

18  because:  (i) it would constitute a default of the existing First Horizon Loan; (ii) it would

19  make it far more difficult if not impossible to obtain financing needed for the Project; and

20  (iii) imposing such a huge amount of debt would put a cloud over the Project, harmful to

21  its success.  Jim Taylor's December 28, 2007 email forwarded to Serpa Sr. confirms that

22  understanding:  "Finally, John has agreed that he will not record his deed of trust."

23      e.    **Construction Financing**.  As part of their work responsibilities as joint

24  venturers, the Serpas agreed to procure construction financing from First Horizon or

25  another lender, and to provide personal guaranties as needed to obtain that important loan.

26  The Serpas obtaining the construction financing was a crucial element given its importance

27  to the success of the Project and to eliminating the potential concerns by third party lenders

28  regarding the tax structure requested by the Serpas.

1       f.    **Maturity**.  For the Serpas' tax structure, the note contains a maturity date of

2  May 31, 2014, seven years hence.  The parties chose that date because they believed it to

3  be sufficiently far out that the development would be completed and sold out, and all pro-

4  fits distributed to the co-venturers, well before then.  If the Project was not completed by

5  May 31, 2014, the parties contemplated extending the maturity date until Project comple-

6  tion.  This gentlemen's agreement is reflected in a memo from Taylor's counsel to

7  Serpa Sr., dated February 21, 2007, which states:  "Maturity date to be agreed upon by the

8  parties (and should be extended beyond the contemplated build-out and sale of the

9  project)."  Once the Project is completed and all profits distributed, the Friends Note would

10  become superfluous.  It was always understood and agreed that payments to the co-

11  venturers would only be made from profits generated by the Project, no more no less,

12  whether or not the Project was sufficiently successful as to result in the Serpas' share of the

13  profits reaching the $150 million face amount of the note.

14  **C.**    **The Developer Entities, Including CCR II, Are Created As Additional Forms**

15        **For The Joint Venture.**

16      25.    In 2008, CCT and the Serpas decided to restructure CCR and divide the

17  Property as follows:

18      a.    **CCR II.**  The parties caused CCR II to be created as the joint venture entity

19  to develop the residential subdivision portion of the Project.  Accordingly, for this purpose,

20  CCR II was created and on August 29, 2008, CCR transferred ownership of the residential

21  subdivision and the golf course land to CCR II.  As with CCR, legal ownership of CCR II

22  is held by CCT.

23      b.    **Golf Course Land.**  The parties created the Club at Clear Creek Tahoe, Inc.

24  (the "Club") to develop the golf course, and on August 29, 2008, CCR II transferred

25  ownership of the golf course land to the Club.  As with CCR, legal ownership of the Club

26  is held by CCT.

27      c.    **Open Space.**  The rest of the Property remained with CCR to be designated

28  as open space by placing a conservation easement on that land.

1  CCR, CCR II and the Club shall sometimes be referred to collectively as the "Developer

2  Entities."

3          26.      Both CCR II and the Club, like CCR, were intended, understood and agreed

4  by the parties to be additional forms for their joint venture, with the Serpas' interest in those

5  entities reflected in the Friends Note for tax purposes.  As alleged, the Friends Note calls

6  for payments derived solely from the income of CCR.  However, with the restructure, the

7  only asset remaining with CCR is the open space which is not realistically expected to

8  derive any income.  Accordingly, if the Friends Note was intended to reflect a true

9  lender/borrower relationship, then the Serpas would have required the note be modified to

10  require payment from income generated by CCR II and the Club as well.  That they did not

11  reflects the parties' understanding that the note was merely intended to be a form, for tax

12  purposes, and that the true intent and agreement was that CCT and the Serpas were joint

13  venturers in the form of CCR and upon their creation, in CCR II and the Club as well.

14  **D.      The Serpa's Subsequent Conduct Consistent With Their Being Joint Venturers**

15  **          In The Form Of CCR, CCR II And The Club.**

16          27.      CCT and the Serpas not only treated each other as joint venturers in the form

17  of CCR, CCR II and the Club, but also actively took part in their development and in

18  addressing the problems soon to come with the start of the recession.  The Serpas' conduct

19  which further confirms their role as joint venturers includes:

20          a.      **The Serpas' Not Recording The Friends Trust Deed.**  If a standard

21  secured loan was the intent, the Serpas promptly would have recorded the Friends Trust

22  Deed to secure the Friends Note as does a real lender.  They did not do so precisely

23  because the Friends Note was merely the form of their joint venture interest in CCR,

24  CCR II and the Club, and recording that trust deed would be detrimental to the Project, as

25  described above.

26          b.      **The Serpas' Clear Creek Website Link.**  After formation of the joint

27  ventures in the form of CCR, CCR II and the Club, Keith Serpa included a link to the Clear

28  Creek website in his email signature, along with links to the Serpas' operating company,

1   DGD Development, and to their other development project known as Chateau Heavenly.

2   A lender would not include a borrower's project in their signature line.  Rather, links on

3   signature lines for developers typically reference the development businesses they own and

4   operate.  Thus, Keith Serpa's inclusion of the Clear Creek website with the Serpas' other

5   owned businesses acknowledges their joint venture ownership interest in CCR II and the

6   other Developer Entities.

7          c.      **The Serpas' Pursuit Of The Construction Loan.**  In performance of the

8   Serpas' role as joint venturers, Serpa Sr. applied for and pursued construction financing for

9   the Project from First Horizon.  In connection with that effort, Serpa Sr. submitted a formal

10  loan request and provided the lender with information on the Project.  A lender would not

11  engage in such activities.

12         d.      **The Serpas' Capital Contributions.**  In performance of the Serpas' joint

13  venture obligation to contribute 60% of capital requirements, they contributed approxi-

14  mately $1.7 million, including $700,000 for interest payments on the First Horizon Loan in

15  the early stages of the Project.  A true lender would not contribute capital to a venture.

16         e.      **The Serpas' Negotiations With First Horizon**.  In the Serpas' role as co-

17  venturers, they participated in negotiating important agreements with First Horizon bene-

18  ficial to the Project.  First, the Serpas, with Taylor's assistance, negotiated a release of the

19  First Horizon lien on the portion of the Property designated for the golf course.  This

20  allowed the Club to obtain financing from Textron for the development of the golf course,

21  the centerpiece of the Project.  Second, the Serpas, also with Taylor's assistance, negotiated

22  First Horizon's release of approximately 853 acres of the Property to be designated as open

23  space under a conservation easement, the tax benefits of which could be used to attract

24  investor capital to the Project.  To obtain the First Horizon's agreement to release the golf

25  course and open space land, Taylor and Hanly were asked to, and did, provide personal

26  guarantees (along with Serpa Sr.) of the First Horizon Loan.  Their doing so again reflects

27  that Clear Creek is a joint enterprise.  Third, the Serpas took the lead in obtaining an

28  extension of the First Horizon Loan to September 2008.  Fourth, after the loan matured, the

1 Serpas participated with Hanly and Taylor in convincing First Horizon to require only

2 interest payments, to be patient on receiving any principal reduction, and to be amenable to

3 a discounted payoff for the benefit of CCR II.  A true lender would not engage in these

4 activities.

5     f.    **Communications Among The Serpas And Their Partners.**  From the

6 beginning, and throughout the course of the Project, CCT (through its principals Taylor and

7 Hanly) have kept its co-venturers, the Serpas, fully advised of all ongoing activities,

8 problems, needs and plans.  Taylor and Hanly did so by, among other things, providing

9 (i) business plans; (ii) status reports; (iii) financial reports; (iv) executive summaries;

10 (v) memos; (vi) meeting agendas; and (vii) emails.  In addition, Taylor and Hanly had

11 numerous telephone calls and meetings with the Serpas concerning the Project.  In all of

12 these communications, Taylor and Hanly provided full information to the Serpas

13 concerning the Project, including confidential information regarding the serious challenges

14 the project was facing due to the worsening recession, strategies to address those problems,

15 potential investors and other matters which only joint venturers would share.  The Serpas

16 not only actively participated in these communications, but frequently and freely offered

17 input, requests, suggestions, demands and advice, again confirming their role as joint

18 venturers, not lenders.  The fact is that the Serpas were treated as joint venturers, and

19 participated as joint venturers, throughout the course of this Project.

20     g.    **The Serpas' Exercise Of Control Over Project Activities**.  Not only did

21 the Serpas participate in Project activities, they demanded and exercised control of the

22 affairs of CCR, CCR II and the Club.  For example, in 2008, the Serpas demanded a

23 revised and more detailed business plan, requiring Serpas' consent to any changes.  Taylor

24 provided that business plan on June 8, 2008, as well as subsequent business plans to reflect

25 the ever-changing and worsening market conditions and what was needed to address them

26 for the benefit of the Project.

27     h.    **Dilution Of The Serpas' Joint Venture Interest In CCR II**.  By 2008, the

28 Project was strapped for money due to the Serpas' failure to obtain the construction loan

1  and to contribute capital, as well as the worsening recession.  The Serpas refused to

2  provide their share of capital, claiming lack of funds.  To obtain the needed capital, CCT

3  contributed $5 million in additional capital.  Where one joint venturer does not contribute

4  capital, and the others do, both common practice and fairness dictate that the non-

5  contributing joint venturer's ownership interest be reduced.  That is what occurred here; the

6  parties determined that the $5 million new capital would be given a 3% profit participation

7  interest, reducing the Serpas' share from 60% to 58.2% (60% x 97%).  See June 15, 2008

8  memo from Taylor to Serpa which confirms:  "When we brought in the last $5 Million, we

9  treated it as a capital call wherein Friends gave up 60% of 3% and Hanly/Taylor [i.e.,

10  CCT] gave up 40% of 3% and added the incremental $5 Million to the original $15 Million

11  in terms of priority and the 10% preference."  This dilution reflects the fact that the parties

12  were joint venturers; a true lender would not agree to reduce its right to receive payment as

13  a result of capital contributions made to the borrower.

14          i.     __The Serpas' Requested Reduction Of The Friends Note From $150 Mil-__

15  __lion To $65 Million__.  In 2009, the Serpas raised concerns over the $150 million face

16  amount specified in the Friends Note.  That face amount resulted, for tax purposes, in the

17  Serpa's being imputed interest on the full amount of the purported $150 million loan.

18  Serpa Sr. requested Taylor to hold off finalizing the CCT tax returns for 2008 until this

19  problem was resolved.  There were subsequent discussions with Serpa Sr. and his

20  accountant over the problem.  The Serpas subsequently requested that their $85 million

21  profit participation under the Friends Note be eliminated, that the note be reduced to

22  $65 million reflecting their deemed capital contribution, leaving their $85 million profit

23  participation with a 60/40 split to the gentlemen's agreement.  The parties agreed, and

24  CCT's 2007 tax return was amended and the 2008 tax return was revised accordingly.  This

25  expedient agreement to eliminate $85 million from the Friends Note, again for tax reasons,

26  further manifests the fact that the Serpas' joint venture interest in CCR II and the other

27  Developer Entities was given in the form of the Friends Note.

28

**E.     The Development Of The Clear Creek Project – CCT's Accomplishments.**

28.     Since the formation of the venture, CCT and its principals, Taylor and Hanly, have given the Project their all; they have spent most of their time, effort, energy and resources for over four years on trying to make the Project a success.  Despite the serious and continuing recession and the Serpa's breaches of their obligations to contribute capital and their other wrongs, Taylor and Hanly have accomplished a significant amount, including the development of a world-class golf course, the jewel of the Project, to the benefit of all venturers.

**1.     The Clear Creek Team – The Best In The Business.**

29.     Early on, Taylor and Hanly attracted the golf course design firm of Coore & Crenshaw to design the golf course to be the centerpiece for the Project.  In addition, Taylor and Hanly put together an excellent team for the Project, including:  (i) Hart-Howerton, for land planning, architecture and design; (ii) Manhard Engineering, for civil engineering requirements for the Project; (iii)  Spiker Communications, for promotional and marketing materials; and (iv) Mark Sollenberger to execute club membership and real estate sales.  Prospects were bright and hopes were high, and the work was full speed ahead.

**2.     CCT's Raising Of Capital In The Recession.**

30.     The Serpas' primary responsibility was to obtain the crucial construction loan to provide the funds to pay off the First Horizon Loan and pay for the development of the golf course and the infrastructure for the residential subdivision.  Unfortunately, the Serpas failed to obtain this construction loan prior to the recession, which began in early 2008 and has become one of the worst downturns since the Great Depression.

31.     The recession has had two significant negative impacts on the Project.  First, the recession caused financial markets to dry up and construction financing became unavailable.  As a result, the parties needed to look for other sources of funds including capital contributions by CCT and the Serpa Parties themselves as agreed upon in the gentlemen's agreement.  Second, demand for residential lots, the sale of which was to be the Project's primary income source, plummeted.  Unfortunately, with the continuing and

worsening recession these two impacts have magnified.  The resulting challenges required that the co-venturers be flexible, work together, and step up with required capital to see this Project through the recession, to success.  Otherwise, all would be lost.  CCT and its principals Taylor and Hanly rose to meet these challenges.

32.     As stated, the Developer Entities required funds from capital contributions and other sources to proceed with the Project.  Unfortunately, in early 2008, the Serpas refused to provide any further capital, claiming they simply had no funds.  Keith Serpa confirmed this in his October 19, 2009 email which states:  "Furthermore, we no longer have the resources to continue to fund any costs associated with the Project without being reimbursed."  CCT could have taken hostile action against the Serpas, demanding they honor their obligation to contribute 60% of capital, and file a lawsuit if they failed to do so.  However, they took the Serpas at their word, that they lacked the funds, and believed such action against the Serpas would be counter-productive to the Project.  Instead, CCT and its principals, Taylor and Hanly, took the high road, choosing to maintain good relations with the Serpas, and at the same time look for alternative capital for the Project.  The success of the Project was what was important to them, and as success was achieved, they were confident that fair adjustments would be worked out.

33.     Through their hard work and dedication, Taylor and Hanly were able to obtain capital to move the Project forward.  They not only contributed their own funds, but obtained loans and capital from numerous other sources.  Including CCT's initial equity investment, they secured over $52 million in capital for the Project – a great accomplishment given the recessionary times in which it was raised.  The Serpas' $1.7 million in capital contributions pales by comparison.

**3.     Clear Creek Golf Course.**

34.     Taylor and Hanly worked very closely with Coore & Crenshaw to design a world-class golf course for the Clear Creek project.  To finance its construction, the Club negotiated a $10.5 million loan with Textron.  The Textron loan, however, required $6 million in equity, which Taylor was able to obtain by way of a $3 million bank loan

1  (guaranteed by Taylor), and $3 million from the "Founders" program Taylor had

2  established.

3          35.      With these funds, the Club retained Project consultants and contractors, and

4  constructed the Clear Creek golf course.  The golf course was built on time and under

5  budget making additional funds available for both a permanent club house and an entire

6  year's operating and maintenance costs.  The course opened in July 2009 to national

7  acclaim.

8          36.      Unfortunately, due to the Serpas' breach of their obligation to contribute

9  capital and their other wrongful conduct, the Textron loan went into default, and Textron

10  foreclosed on the golf course on July 13, 2011.  It is CCT's present intention to reacquire

11  the golf course or otherwise secure its availability for the benefit of the residential

12  subdivision owned by CCR II.

13          **4.      CCR II's Residential Subdivision.**

14          37.      The residential subdivision owned by CCR II, consisting of approximately

15  530.74 acres, is the profit center for the Project.  The parties anticipated that the proceeds

16  from the sales of the residential lots would generate the funds not only to pay debts, but

17  hopefully to return all of CCT's and the Serpa Parties' capital contributions (with preferred

18  return) and to provide the profit.  Taylor and Hanly accomplished several very important

19  things with respect to the subdivision.  First, working with Douglas County, Taylor and

20  Hanly caused the Project to be approved as part of a Special Assessment District wherein

21  public improvements could be financed through bonds.  Second, Taylor and Hanly were

22  successful in having Douglas County approve the construction of up to 18 residential units

23  as "temporary overnight accommodations" without the need to bring public infrastructure

24  to the Project.  Third, and of great importance, Taylor and Hanly were successful in

25  extending CCR II's permits for all entitlements for five years, no small accomplishment in a

26  County that has a Slow Growth Initiative.

27          38.      The First Horizon Loan, which is secured by the residential subdivision,

28  matured on September 2, 2008.  Taylor worked closely with First Horizon from then

1  through March 2010, keeping the lender content with receiving interest-only payments (at

2  the non-default rate) which, through Taylor's capital-raising efforts, CCR II was able to

3  pay.  Moreover, Taylor made significant progress in negotiating a discount with First

4  Horizon for the benefit of CCR II.  (As alleged below, the Serpas usurped this joint venture

5  opportunity by surreptitiously purchasing the First Horizon Loan at a substantial discount,

6  for their own benefit and to the detriment of CCR II.)

7        **5.**    **Conservation Easement.**

8        39.    The Clear Creek Property includes substantial land which was available for

9  dedication as open space.  Taylor came up with the idea to so dedicate that land under a

10  conservation easement which could result in significant tax benefits to investors.  Taylor

11  was able to attract the pre-eminent conservation organization, The Nature Conservancy, to

12  accept this easement.  This effort has been important in gaining public support for the

13  Project including from conservationists who initially opposed the Project.

14        **6.**    **Lake House.**

15        40.    Among the unique amenities for the Project is the Lake House, a two-acre

16  parcel on Lake Tahoe with an attractive historic house amenable for use as a club with

17  restaurant/bar for Clear Creek residents and members.  The Lake House is in an ideal loca-

18  tion, close to the Heavenly Valley ski resort and the South Shore casino and entertainment

19  facilities.  For these reasons, the co-venturers agreed to include the Lake House as an

20  amenity within the Clear Creek Project.

21        41.    The Lake House is owned by Tahoe III, LLC ("Tahoe III"), a Serpa entity.

22  To include this amenity in the Project, Tahoe III entered into a lease agreement with

23  CCR II with an option to purchase.  CCR II spent approximately $300,000 in renovating

24  the Lake House and over $800,000 in lease payments to Tahoe III.

25        42.    Unfortunately, due to the recession and lack of capital contributions from the

26  Serpas, CCR II ceased making lease payments in 2010.  The Serpas' fiduciary obligations

27  require them, under the circumstances, to forego the lease payments (or deem them Serpa

28  capital contributions), and allow the Lake House to remain as an amenity for the long-term

1  success of the Project.  Instead, the Serpas sent a notice which purports to terminate the

2  lease, and have retaken possession of the Lake House.  Moreover, they have threatened

3  CCR II with a lawsuit for additional rent.  Such a lawsuit would be in further breach of

4  their fiduciary obligations.  CCT has requested that the Serpas not pursue any such claim,

5  but instead return the Lake House to the Project.  The Serpas have ignored this request.

6      **7.    Fairfield Ranch.**

7      43.    The Fairfield Ranch contains approximately 4,243 acres of property which

8  was owned by a Serpa entity called Fairfield-Topaz, LLC.  The property is located approxi-

9  mately 26 miles from the Clear Creek Property and includes undeveloped land through

10 which the West Walker River runs.  Taylor is an experienced fly fisherman and, upon

11 looking at this property, saw its potential as a one of the best fly fishing locations in the

12 Western United States.  The co-venturers agreed that the portion of the Fairfield Ranch

13 adjacent to the river should be included as an amenity with the Project.  As with the Lake

14 House, the co-venturers caused Fairfield-Topaz, LLC to enter into a lease with CCR, with

15 an option to purchase the fly fishing portion, approximately 2,200 acres.  CCR then entered

16 into a sublease of the property to CCR II.  The Serpas were responsible for parcelizing  the

17 property so that the fly fishing portion could be transferred to CCR.  However, the Serpas

18 failed to parcelize the property and further allowed the loan on the property to go into

19 default and foreclosure.  In the hope of saving the fly fishing amenity, Taylor convinced

20 one of CCT's capital investors again to step in.  That investor provided the funds necessary

21 to bring the loan current and to conclude the purchase of the entire ranch from the Serpas.

22 **F.    Serpas' Breaches Of Contractual And Fiduciary Duties, Fraud And Other**

23     **Wrongs.**

24     44.    After entering into the joint venture relationship in the form of CCR II and

25 the other Developer Entities, the Serpas have breached their contractual and fiduciary

26 duties, and committed other wrongs, including as alleged above and as follows:

27

28

**1.    The Serpas' Breach Of Obligation To Contribute Capital.**

45.    As a joint venturer with CCT in CCR II and the other Developer Entities, and pursuant to the gentlemen's agreement, the Serpas agreed to provide 60% of all required capital contributions.  Pursuant to that agreement, the Serpas contributed capital until 2008, when they ceased doing so, representing to CCT and its principals that they lacked funds. Plaintiffs allege on information and belief that the Serpas' representation was false, as their surreptitious purchase of the $15 million First Horizon Loan demonstrates (see below).  In any event, the Serpas' failure to make their capital contributions is in breach of their agreement and has caused CCT, CCR II, the other Developer Entities and the Project significant damages, including damages resulting from the loss of the golf course and other Project amenities and from CCR II's inability to install the infrastructure necessary for the sale of residential lots within the residential subdivision.

**2.    The Serpas' Wrongful Recording Of The Friends Trust Deed.**

46.    As alleged above, the Serpas agreed not to record the Friends Trust Deed. Moreover, the Serpas' fiduciary duties prohibited them from doing so both because (1) the Friends Note and Friends Trust Deed were the form for the Serpas to hold their joint venture interests, for tax purposes, and (2) recording the Friends Trust Deed would breach the First Horizon Loan, preclude additional financing and put a cloud over the Project.  In breach of their agreement and their fiduciary duties, the Serpas recorded the Friends Trust Deed on May 10, 2011, encumbering the entire residential subdivision (even though it was no longer owned by CCR).  That action has further damaged CCT, CCR II and the Project, including by deterring potential lenders and investors.

**3.    The Serpas' Refusal To Restructure The Friends Note And Trust Deed.**

47.    At the time the venture was formed, with the Serpas' representation that they would obtain the construction loan for the Project, putting the Serpas' joint venture interest in the form of the Friends Note and Friends Trust Deed did not present a problem. However, the Serpas were unable to obtain the construction loan, and instead the economy went into the severe recession.  With the recession, and the resulting difficulty in attracting

capital, the Friends Note and Friends Trust Deed presented a significant impediment to attracting capital; that enormous debt simply scared away potential investors. As a result, it became essential to eliminate the Friends Note and Friends Trust Deed, and restore substance over form by placing the Serpas' interest where it ought to be, as a joint venture interest in CCR II and the other Developer Entities.

48.    Taylor and Hanly made numerous requests to the Serpas that they agree to do so. Unfortunately, and in breach of their fiduciary duties, the Serpas refused. As a result, CCR II and the other Developer Entities have been unable to attract critically needed capital, including the capital needed to prevent Textron's foreclosure of the golf course, to the detriment and damage of CCT, CCR II, the other Developer Entities, and the Project.

**4.    The Serpas' Demands For Money.**

49.    Instead of making their required capital contributions, and in disregard of the severe financial challenges facing CCR II and the Project, the Serpas have made numerous demands for money, including payments under the Lake House lease. Taylor has pleaded that the Serpas relent, and put the interests of the Project before their personal interests. The Serpas disregarded these pleas and their fiduciary obligations, and continued to demand money. For example, Keith Serpa's January 12, 2011 email to Taylor and Hanly, threatens: "Outside of the Sierra Clouds and Nevada Friends issues, you still have past due obligations to us. . . . I told you previously that we would [sic] making a serious effort to collect on the past due amounts on the Lake House and the Water Rights note."

**5.    The Serpas' Refusal To Cooperate.**

50.    Taylor and Hanly made great efforts and pursued numerous opportunities to attract investors to the Project so critically needed to weather the recession. To attract those investors, the co-venturers needed to be flexible and provide full cooperation. The Serpas, however, refused to provide that flexibility and cooperation, resulting in lost opportunities to the detriment of CCT, CCR II, the other Developer Entities, and the Project.

1  **G.     The Serpas' Theft of The First Horizon Loan Opportunity.**

2       51.     As alleged, the First Horizon Loan is secured by the residential subdivision

3  owned by CCR II.  CCT and the Serpas, as co-venturers, made payments on the First Hori-

4  zon Loan.  However, when the loan matured on September 1, 2008, CCR II lacked the

5  funds to pay off the principal balance of $15 million.  Fortunately, First Horizon was

6  content to accept interest only payments at the non-default rate; it never expressed any

7  urgency that the loan be paid, much less any interest in initiating a foreclosure of the

8  Property.  Although the Serpas had ceased making capital contributions contrary to their

9  agreement, CCT continued to make the interest payments on the loan.

10       52.     With the worsening economic situation, CCT and the Serpas realized that the

11  matured First Horizon Loan had to be worked out.  Through 2009 and early 2010, Taylor

12  dealt directly with Bo Boxold with First Horizon, with the Serpas full knowledge and

13  consent.  Taylor not only kept the Serpas informed, but the Serpas offered input on

14  direction and strategy.  As the Serpas also knew, Taylor was looking for a financial partner

15  who could provide needed capital, including to pay a negotiated discount on the First

16  Horizon Loan.  Mr. Boxold expressed his willingness to work with Taylor to negotiate a

17  discounted pay off.

18       53.     A meeting was scheduled with Taylor and Mr. Boxold for March 3, 2010.

19  On March 1, Taylor sent Keith Serpa an email, inviting the Serpas to attend, and stating:

20       "The purpose of <u>our</u> meeting with Bo is to maintain
        communications so that FH does not do anything that <u>we</u> are not
21       expecting.  This is crucial now as <u>we</u> are attempting to round up
        a financial partner – <u>we</u> do not want to be having negotiations
22       with Colony or anyone else with a notice of default on record.
        In addition, it will allow <u>us</u> to explore the possibility of having
23       FH actually provide <u>us</u> with the infrastructure financing and
        approach the project from a completely different perspective."
24       (Emphasis added.)

25

26

27       54.     In response, Keith Serpa sent his March 2 email, offering his advice as a co-

28  venturer, including:

"Secondly, in your discussions with First Horizon, please do not make any mention of any discussions with Colony Capital or any other possible pay off on the $15 million note, discounted or otherwise, I think we need to get a little further along in our discussions internally and have cash in hand before bringing that up to FH."  Then, during the meeting on March 3, Keith Serpa emailed Mr. Taylor, advising:  "Resist talking about CC and someone buying the note.  We don't need to throw out any numbers that could be too high."  (Emphasis added.)

This Keith Serpa email not only further confirms the joint venture in the form of CCR II, but acknowledges the co-venturers' plan – to negotiate a discounted pay off with First Horizon using funds for the benefit of CCR II.

55.    The March 3 meeting was productive.  Mr. Boxold was willing to accommo-date a work-out beneficial to CCR II, including a discounted pay off.  Concerning the discounted pay off, Taylor's March 3, 2010 email to Keith Serpa confidentially reported: "both Chip and I got the sense from the meeting that FH would probably take $7.5MM for the note, perhaps less."  That represented potentially over a 50% discount for the benefit of CCR II.  Moreover, it was clear from the meeting that First Horizon would provide the co-venturers time to negotiate the work-out and time to make the discounted pay out thereunder so that CCR II could secure financing from a new financial partner or from other sources.  First Horizon was not threatening any immediate foreclosure.  Of course, such a work-out offered an important opportunity to CCR II, as the co-venturers were well aware.

56.    The next day, Taylor and Hanly had discussions with the Serpas to debrief them on the March 3 meeting with Mr. Boxold and to discuss strategy and approach to negotiate the work-out for the benefit of CCR II.  During those discussions, Serpa Sr. requested to take the lead in negotiating the work-out with First Horizon for the benefit of CCR II.  Due to the Serpas' long-standing relationship with First Horizon and the press of other urgent Project matters, Taylor and Hanly agreed.  However, they made clear that this agreement, allowing Mr. Serpa to negotiate with First Horizon for CCR II, was conditioned

on the Serpas' keeping Taylor and Hanly, and thus CCT, fully informed and obtaining their input and consent before finalizing any work-out agreement.  Serpa Sr., on behalf of all the Serpas, promised to do so.  The Serpas' promise and agreement regarding the First Horizon negotiations are confirmed in emails, including:

- Keith Serpa's March 5, 2010 email to Mr. Taylor:  "Per Senior, Chip and yourself are okay with stepping aside and allowing us to pursue a discount on First Horizon.  Is that correct?"

- Taylor's March 5, 2010 response email to Keith Serpa:  "With respect to pursuing the discount with First Horizon, we are fine with the Serpas taking the lead in this with the understanding that we would be involved in any final decision and its impacts on Clear Creek."

57.    The Serpas' promise to keep CCT and its principals informed and obtain their consent to any work-out was false, i.e., they made the promise without any intent to perform.  The Serpas' subsequent actions show that they never had any intention of living up to their promise and agreement.

58.    Not hearing anything from the Serpas, Taylor sent an April 1, 2010 email to Keith Serpa, inquiring of the status:  "What is happening re: First Horizon?  We would appreciate your letting us know," Mr. Serpa responded that day, stating:  "As of yet, nothing has happened with First Horizon.  We will let you know as soon as anything changes."  Yet another promise the Serpas never intended to perform.

59.    Having removed Taylor and Hanly, and thus CCT, from the First Horizon negotiations and keeping them in the dark, the Serpas proceeded to negotiate the discounted purchase of the $15 million First Horizon Loan for their own personal benefit.  Plaintiffs allege on information and belief that the Serpas' counsel, Scott Heaton, participated in some capacity in connection with the purchase.  On or about April 30, 2011, the Serpas purchased the First Horizon Loan, which took the form of an assignment of the loan to another Serpa entity, defendant Sierra Clouds.  Plaintiffs allege on information and belief

1  that the Serpas purchased the loan for approximately $6.4 million, a whopping 58%

2  discount.

3        60.    The Serpas did all of this in total secrecy, without in any way informing CCT,

4  a clear usurpation of a CCR II opportunity.  The Serpas' nefarious plan:  to falsely represent

5  to CCT that Sierra Clouds is a non-Serpa entity, to keep CCT in the dark as to the terms of

6  the purchase, and to use the First Horizon Loan to threaten foreclosure on the residential

7  subdivision, CCR II's major asset, in order improperly to extract money and other

8  concessions from CCR II, CCT and CCT's principals and their capital investors.

9        61.    After the Serpas, through Sierra Clouds, surreptitiously purchased the First

10  Horizon Loan, they falsely represented to CCT and its principals that Sierra Clouds was an

11  independent and unrelated entity to the Serpas.  For example, Keith Serpa's May 24, 2010

12  email to Taylor attaches a purported letter from Sierra Clouds, and states:

13            "In the letter, Sierra Clouds LLC is requesting to be brought
          current on the past due balances.  They also reference their
14            ability to charge the default rate for interest.  It was my under-
          standing that they are a friendly company to our project.  I was
15            a little surprised by the stern tone of the letter, but Scott Heaton
          assured me they are reasonable people.  He did caution me that
16            they are sophisticated investors that expect a good return on
          their money."

17

18  Contrary to the representations in this email and in other communications from the Serpas,

19  on information and belief, Sierra Clouds is owned and controlled by the Serpas, and they

20  created this fiction as part of their plan to coerce money from CCR II, CCT and CCT's

21  principals and their capital investors.

22        62.    At the same time the Serpas were falsely representing that Sierra Clouds was

23  an independent company, the Serpas and Heaton refused to provide any details about Sierra

24  Clouds or its acquisition of the First Horizon Loan.  With the First Horizon Loan in hand,

25  the Serpas then wrongfully, and in breach of their contractual and fiduciary obligations,

26  recorded the Friends Trust Deed on May 10, 2011.

27        63.    To summarize, the Serpas' surreptitious acquisition of the First Horizon Loan

28  and other actions are in breach of their fiduciary duties and highly improper for several

reasons.  First, the opportunity to purchase at a discount or otherwise reach a work-out with First Horizon is an opportunity of CCR II, which the Serpas usurped when they surreptitiously negotiated and purchased the First Horizon note for themselves.  Second, the Serpas usurped that opportunity by fraud, i.e., falsely promising to act on behalf of CCR II, to keep CCT informed and obtain its consent to any agreement with First Horizon.  Third, the Serpas breached their fiduciary duties by concealing their nefarious plan, purchasing the First Horizon Loan for their own benefit, and then concealing they had done so.  Fourth, the Serpas further breached their fiduciary duties and committed fraud by misrepresenting that Sierra Clouds is a non-Serpa entity.

64.    Subsequent to the Serpas' acquisition of the First Horizon Loan through Sierra Clouds, they made numerous demands for money on CCT and CCR II, threatening to foreclose on CCR II's property, the residential subdivision, if their demands were refused. Plaintiffs refused their improper demands.

65.    In further breach of their fiduciary duties, the Serpas instigated foreclosure proceedings on the First Horizon Loan by recording a Notice of Trustee's Sale on June 22, 2011, setting the foreclosure sale date for July 19, 2011.  By letters dated June 29, 2011 and July 12, 2011, CCT's counsel demanded that the Serpas and Sierra Clouds rescind the Notice of Trustee's Sale and withdraw the foreclosure sale, which demands the Serpas and Sierra Clouds ignored.  As a result, Plaintiffs commenced the bankruptcies in part to stop this wrongful foreclosure sale.

## FIRST CLAIM FOR RELIEF

**(Avoidance Of Friends Trust Deed - 11 U.S.C. §§ 544, 550 And 551 –**

**By Plaintiffs Against The Serpa Defendants)**

66.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in the above paragraphs.

67.    CCR executed and delivered the Friends Trust Deed to the Serpas in May 2007 in order to provide further appearance of bona fides to the Serpas' tax structure. Although it was understood and agreed between the parties that the Serpas would not

1  record the Friends Trust Deed, in violation of their agreement and in breach of their

2  fiduciary duties to CCT, the Serpas caused the Friends Deed of Trust to be recorded on

3  May 10, 2010.

4        68.     After executing and delivering the Friends Trust Deed and prior to the date

5  that the Serpas caused the Friends Trust Deed to be recorded, CCR conveyed all of its right,

6  title, and interest in the residential subdivision to CCR II pursuant to a grant deed recorded

7  on or about August 28, 2008.  Accordingly, on and after August 28, 2008, CCR no longer

8  owned any right, title, or interest in the residential subdivision.

9        69.     Because CCR, the trustor under the Friends Trust Deed, did not own any

10  right, title or interest in the residential subdivision on the date that the Serpas caused the

11  Friends Trust Deed to be recorded, the Friends Trust Deed was recorded outside the chain

12  of title under Nevada law.  Moreover, in accordance with Nevada law, because the Friends

13  Trust Deed is not within the chain of title, the Friends Trust Deed does not, as a matter of

14  Nevada law, provide constructive notice to any bona fide purchaser for value of the

15  residential subdivision or any lien creditor.

16        70.     Under Nevada law, any interest in real property that is not properly recorded

17  in the chain of title is void as a matter of law against a purchaser of such real property who

18  acted in good faith and provided valuable consideration.  Moreover, under Nevada law,

19  judicial and execution lien creditors take priority over any interest in real property that is

20  not properly recorded in the chain of title.

21        71.     In accordance with Section 1107 of the Bankruptcy Code, subject to any

22  limitations on a trustee serving in a case and such limitations or conditions that the Bank-

23  ruptcy Court prescribes, a debtor in possession under chapter 11 of the Bankruptcy Code is

24  vested with all the rights (other than the right to compensation) and powers of a trustee

25  serving in a case under chapter 11 of the Bankruptcy Code.

26        72.     Under Section 544(a)(1) of the Bankruptcy Code, CCR II, as debtor in

27  possession, is vested with the status of a creditor that extends credit to the debtor at the time

28  of the commencement of the case, and that obtains, at such time and with respect to such

credit, a judicial lien on all property on which a creditor on a simple contract could have

obtained such a judicial lien, whether or not such a creditor exists. Moreover, under

Section 544(a) of the Bankruptcy Code, CCR II, as debtor in possession, has the rights and

power to avoid any transfer of real property that is voidable by such a hypothetical lien

creditor under applicable state law and, pursuant to Section 551 of the Bankruptcy Code, to

preserve the avoided transfer for the benefit of CCR II's bankruptcy estate.

73.    Under Section 544(a)(2) of the Bankruptcy Code, CCR II, as debtor in

possession, is vested with the status of a creditor that extends credit to the debtor at the time

of the commencement of the case, and that obtains at such time and with respect to such

credit, an execution against the debtor that is returned unsatisfied at such time, whether or

not such a creditor exists. Moreover, under Section 544(a) of the Bankruptcy Code, CCR

II, as debtor in possession, has the rights and power to avoid any transfer of real property

that is voidable by such a hypothetical lien creditor under applicable state law and, pursuant

to Section 551 of the Bankruptcy Code, to preserve the avoided transfer for the benefit of

CCR II's bankruptcy estate.

74.    Under Section 544(a)(3) of the Bankruptcy Code, CCR II, as a debtor in

possession, is vested with the status of a bona purchaser of the residential subdivision as of

the filing of the voluntary petition without regard to any knowledge of CCR II prior to the

bankruptcy filing. Moreover, under Section 544(a) of the Bankruptcy Code, CCR II, as

debtor in possession, has the rights and power to avoid any transfer of real property that is

voidable by a bona fide purchaser for value of such real property under applicable state law

and, pursuant to Section 551 of the Bankruptcy Code, to preserve the avoided transfer for

the benefit of CCR II's bankruptcy estate.

75.    Because the recording of the Friends Trust Deed does not provide construc-

tive notice as set forth above, the Friends Trust Deed is void pursuant to Nevada law and is

voidable pursuant to Section 544(a)(1), (2), and (3) and 550 of the Bankruptcy Code.

76.    Accordingly, CCR II, as debtor in possession, may avoid the Friends Trust

Deed in accordance with Section 544(a)(1), (2), and (3) and 550 of the Bankruptcy Code

1    and preserve the lien created by the Friends Trust Deed for the benefit of its bankruptcy

2    estate pursuant to section 551 of the Bankruptcy Code.

3        77.    By this cause of action, CCR II seeks a declaration and judgment voiding the

4    Friends Trust Deed.

5                              **SECOND CLAIM FOR RELIEF**

6            **(Declaratory Relief (28 U.S.C. § 2201) – By Plaintiffs Against**

7                              **The Serpa Defendants)**

8        78.    Plaintiffs repeat, reallege and incorporate herein by reference each and every

9    allegation contained in the above paragraphs.

10       79.    An actual controversy has arisen between Plaintiffs, on the one hand, and the

11   Serpa Defendants, on the other hand, regarding the rights and liabilities of the Serpa Defen-

12   dants and NNTC as relating to CCT, CCR II and the Project, including as alleged in the

13   next two paragraphs.

14       80.    Plaintiffs claim and contend that:

15           (a)    That the Serpas' rights and liabilities as relating to CCT and CCR II be

16   determined in furtherance and in harmony with the joint purpose of those parties, as

17   joint venturers, for the development of the Project;

18           (b)    For purposes of those rights and liabilities, the form of the Serpas'

19   interest, including the Friends Note and Friends Trust Deed, be disregarded;

20           (c)    The Serpas and their affiliates including Sierra Clouds owe fiduciary

21   duties to CCT, CCR II and the other Developer Entities in connection with the

22   Project;

23           (d)    The Serpas are obligated to provide their share of all needed capital

24   contributions for the Project;

25           (e)    The Serpas and CCT are to share profits generated from the Project as

26   alleged herein;

27           (f)    The Serpas are obligated to perform the agreed-upon work and assist

28   CCT as needed for their joint development of the Project;

1    (g)  The Serpas are under a duty not to record the Friends Trust Deed;

2    (h)  The Serpas are under a duty not to usurp opportunities of CCT, CCR II

3 and the Developer Entities concerning the Project.

4    81.  Plaintiffs allege on information and belief that the Serpa Defendants dispute

5 the contentions set forth in the foregoing paragraph.

6    82.  Plaintiffs desire a judicial determination and declaration of the rights and

7 duties of Plaintiffs and the Serpa Defendants as relating to CCT, CCR II and the Project,

8 including on the claims and contentions set forth in Paragraph 80 above.  Such declarations

9 are necessary and appropriate at this time so that the respective rights and obligations of the

10 parties are ascertained and complied with.

11         **THIRD CLAIM FOR RELIEF**

12    **(Breach Of Fiduciary Duty – By Plaintiffs Against The Serpa Defendants)**

13    83.  Plaintiffs repeat, reallege and incorporate herein by reference each and every

14 allegation contained in the above paragraphs.

15    84.  By virtue of being joint venturers of the Project and the special and confiden-

16 tial relationship between Plaintiffs and the Serpas, there exists a fiduciary relationship

17 under which the Serpas and their affiliates (including Sierra Clouds) owed, and continue to

18 owe, fiduciary duties to Plaintiffs.

19    85.  The Serpa Defendants have violated and abused the Plaintiffs' trust and

20 confidence in them and breached their fiduciary duties by their conduct as alleged herein,

21 including by the following conduct:

22    (a)  failing and refusing to fund the Serpas' share of capital contributions

23 for the Project;

24    (b)  improperly recording the Friends Trust Deed on May 10, 2011;

25    (c)  failing and refusing to restructure the Friends Note and Friends Trust

26 Deed;

27    (d)  failing and refusing to cooperate with the Plaintiffs to attract investors

28 and otherwise pursue the Project;

(e)     making improper demands for money, including payments on the Lake House lease;

(f)     attempting to terminate the Lake House lease on October 1, 2010, taking possession of the Lake House and threatening CCR II with a lawsuit for additional rent under the Lake House lease;

(g)     failing to parcelize the Fairfield Ranch property so that the fly fishing portion could be transferred to CCR, and allowing the loan on the property to go into default and foreclosure;

(h)     usurping CCR II's opportunity to purchase or otherwise reach a work-out of the First Horizon Loan by surreptitiously purchasing the First Horizon Loan for themselves;

(i)     purchasing the First Horizon Loan by fraud, including by (i) falsely promising to Plaintiffs that the Serpas would act on behalf of CCR II in negotiating a work-out with First Horizon, keep CCT informed of those negotiations, and obtain its consent to any agreement with First Horizon, and (ii) concealing from Plaintiffs their true purpose and actions in purchasing that loan;

(j)     misrepresenting that Sierra Clouds, the entity that acquired the First Horizon Loan, is a non-Serpa entity, and keeping CCT in the dark as to the terms of the purchase and the nature and ownership of Sierra Clouds;

(k)     using the First Horizon Loan to threaten foreclosure on the residential subdivision, CCR II's major asset, in order improperly to extract money and other concessions from CCT and its principals; and

(l)     pursuing foreclosure proceedings on the First Horizon Loan including by recording a Notice of Trustee's Sale on June 22, 2011, and setting the foreclosure sale date for July 19, 2011.

86.     In engaging in the conduct described in Paragraph 85(a)–(l) above, the Serpa Defendants, and each of them, have committed willful misfeasance/misconduct and malfeasance and acted in bad faith.

87. As a result of the Serpa Defendants' breaches of their fiduciary duties in surreptitiously purchasing the First Horizon Loan, Plaintiffs are entitled to a declaration and judgment that: (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the trust deed which secures the First Horizon Loan (the "First Horizon Trust Deed") is invalid and of no force and effect.

88. Based on the joint venture relationship of the parties in the form of CCR II, and as a result of the Serpa Defendants' breach of their fiduciary duties in recording the Friends Trust Deed, Plaintiffs are entitled to a declaration and judgment that the Friends Trust Deed is invalid and of no force and effect.

89. As a proximate result of the Serpa Defendants' breaches of their fiduciary duties, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined at trial.

90. The Serpa Defendants engaged in the wrongful conduct and breached their fiduciary duties with the intent to injure Plaintiffs and to unjustly enrich the Serpa Defendants at the expense of the Plaintiffs. The Serpa Defendants' wrongful conduct was done willfully, maliciously and oppressively against Plaintiffs. Accordingly, Plaintiffs request an award of exemplary and punitive damages against the Serpa Defendants, and each of them.

## FOURTH CLAIM FOR RELIEF

### (Fraud and Concealment – By Plaintiffs Against The Serpa Defendants)

91. Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in the above paragraphs.

92. In or about 2008, and thereafter, the Serpas represented to the Plaintiffs that they lacked the funds to further contribute their share of capital to the Project. On information and belief, the Serpas' representation was and is false as reflected by the fact that they had the funds to purchase the First Horizon Loan. Plaintiffs relied on said representation

1   including by not pursuing claims against the Serpas for payment of their capital

2   contributions and by looking elsewhere for needed capital.

3          93.     The Serpa Defendants made the following promises to Plaintiffs:  (i) to keep

4   CCT and its principals fully informed of their negotiations with First Horizon regarding the

5   work-out of the First Horizon Loan; (ii) to obtain CCT and its principals' input and consent

6   before finalizing any work-out agreement regarding the First Horizon Loan; and (iii) to

7   negotiate the work-out with First Horizon for the benefit of CCR II.  The Serpas made these

8   promises without any intent to perform, which constitutes promissory fraud.  Plaintiffs

9   relied on these promises including by allowing the Serpas to handle the negotiations with

10  First Horizon regarding the work-out of the First Horizon Loan.

11         94.     The Serpa Defendants concealed from CCT and CCR II the following materi-

12  al facts:  (i) they had adequate resources to make their agreed-upon and required capital

13  contributions; (ii) their true intention was to negotiate and purchase the First Horizon Loan

14  for their benefit, not for the benefit of CCR II; (iii) the content of the negotiations with First

15  Horizon; (iv) the Serpa Defendants' purchase of the First Horizon Loan for their benefit;

16  (v) the terms of that purchase; and (vi) the parties who own and/or control Sierra Clouds.

17  Had Plaintiffs known the true facts, they would have acted differently, including to protect

18  their interests as alleged herein.

19         95.     At all times mentioned herein, the Serpas had established a confidential

20  relationship of the utmost trust and confidence with Plaintiffs, and as a result, the Serpas

21  and their affiliates (including Sierra Clouds) owe Plaintiffs and its principals the duty of

22  good faith and full disclosure of all material facts, which were otherwise not reasonably

23  discoverable by Plaintiffs.

24         96.     The Serpa Defendants made the false representations and concealed the

25  material facts as alleged herein with the intent to induce Plaintiffs to act in the manner

26  herein alleged.  The representations made by the Serpa Defendants were false and

27  misleading, and the Serpa Defendants knew that the representations were false and

28  misleading, at the time they were made.

97.     At all relevant times, Plaintiffs were ignorant of the facts which the Serpa Defendants misrepresented, suppressed and failed to disclose.

98.     As a result of the Serpa Defendants' fraudulent conduct, Plaintiffs are entitled to a declaration and judgment that: (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the First Horizon Trust Deed is invalid and of no force and effect.

99.     As a proximate result of the Serpa Defendants' fraudulent conduct, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined at trial.

100.     The Serpa Defendants engaged in the wrongful conduct and fraud with the intent to injure Plaintiffs and to unjustly enrich the Serpa Defendants at the expense of the Plaintiffs.  The Serpa Defendants' wrongful conduct was done willfully, maliciously and oppressively against Plaintiffs.  Accordingly, Plaintiffs request an award of exemplary and punitive damages against the Serpa Defendants, and each of them.

## FIFTH CLAIM FOR RELIEF

### (Equitable Subordination (11 U.S.C. § 510(c)) –

### By Plaintiffs Against The Serpa Defendants)

101.     Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in the above paragraphs.

102.     The Serpa Defendants constitute joint venturers and/or a person with control over Plaintiffs, and thus are statutory insiders under 11 U.S.C. § 101(31).  Even aside from their status as statutory insiders, the Serpa Defendants have some degree of control over Plaintiffs as alleged herein, including broad approval rights regarding the Project.  As insiders, the Serpa Defendants' actions are subject to rigorous scrutiny including in connection with whether such actions justify equitable subordination.

103.     The Serpa Defendants have engaged in inequitable and egregious conduct, warranting equitable subordination of their purported claims and interests, including in the following:  (i) the First Horizon Loan and First Horizon Trust Deed purportedly owned by

1   Sierra Clouds; (ii) the Friends Note and Friends Trust Deed; and (iii) the Serpas' interest in

2   CCR II, the other Developer Entities and the Project (collectively the "Serpa Defendants'

3   Interests"). This inequitable and egregious conduct includes without limitation the

4   breaches of fiduciary duty alleged in Paragraph 85 above.

5          104.   The Serpa Defendants' inequitable conduct resulted in substantial damages

6   not only to Plaintiffs but to their creditors as well.

7          105.   By reason of the foregoing, the Serpa Defendants' Interests should be

8   equitably subordinated to: (i) the claims of CCR II's unsecured creditors; and (ii) the

9   claims and interests of CCR II and CCT (and their constituent members) in the Project. An

10  order should issue providing that any lien securing the Serpa Defendants' Interest be

11  transferred to the bankruptcy estates of Plaintiffs as appropriate. Equitable subordination

12  under the circumstances will achieve a result that is consistent with the purposes of the

13  Bankruptcy Code.

14                        **<u>SIXTH CLAIM FOR RELIEF</u>**

15          **(Constructive Trust – By Plaintiffs Against The Serpa Defendants)**

16          106.   Plaintiffs repeat, reallege and incorporate herein by reference each and every

17  allegation contained in the above paragraphs.

18          107.   By virtue of the Serpa Defendants' wrongful acts in improperly obtaining,

19  retaining, and/or attempting to foreclose on the First Horizon Loan as alleged above, the

20  Serpa Defendants, and each of them, all hold the First Horizon Loan as constructive

21  trustees for the benefit of Plaintiffs.

22          108.   Plaintiffs are entitled to a declaration and judgment that: (i) the First Horizon

23  Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the

24  First Horizon Loan as constructive trustees for CCR II; and (iii) the First Horizon Trust

25  Deed is invalid and of no force and effect.

26

27

28

## SEVENTH CLAIM FOR RELIEF

### (Breach Of Contract and the Good Faith Covenant –

### By Plaintiffs Against The Serpa Defendants)

109.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in the above paragraphs.

110.    The Serpas breached their oral and implied agreements (including the gentlemen's agreement), and the implied covenant of good faith and fair dealing, by the following conduct:

(a)    failing and refusing to fund the Serpas' share of capital contributions for the Project;

(b)    improperly recording the Friends Trust Deed on May 10, 2011;

(c)    failing and refusing to restructure the Friends Note and Friends Trust Deed;

(d)    failing and refusing to cooperate with the Plaintiffs to attract investors and otherwise pursue the Project;

(e)    making improper demands for money, including for payments on the Lake House lease;

(f)    attempting to terminate the Lake House lease on October 1, 2010, taking possession of the Lake House and threatening CCR II with a lawsuit for additional rent under the Lake House lease;

(g)    failing to parcelize the Fairfield Ranch property so that the fly fishing portion could be transferred to CCR, and allowing the loan on the property to go into default and foreclosure;

(h)    usurping CCR II's opportunity to purchase or otherwise reach a work-out of the First Horizon Loan by surreptitiously purchasing the First Horizon Loan for themselves;

(i)    purchasing the First Horizon Loan by fraud, including by (i) falsely promising to Plaintiffs that the Serpas would act on behalf of CCR II in negotiating a

work-out with First Horizon, keep CCT informed of those negotiations, and obtain

its consent to any agreement with First Horizon, and (ii) concealing from Plaintiffs

their true purpose and actions in purchasing that loan;

      (j)     misrepresenting that Sierra Clouds, the entity that acquired the First

Horizon Loan, is a non-Serpa entity, and keeping CCT in the dark as to the terms of

the purchase and the nature and ownership of Sierra Clouds;

      (k)     using the First Horizon Loan to threaten foreclosure on the residential

subdivision, CCR II's major asset, in order improperly to extract money and other

concessions from CCT and its principals; and

      (l)     pursuing foreclosure proceedings on the First Horizon Loan including

by recording a Notice of Trustee's Sale on June 22, 2011, and setting the foreclosure

sale date for July 19, 2011.

    111.   Plaintiffs fully performed all conditions, covenants and promises, if any, to be

performed on its part, except where excused or prevented from performing by the Serpa

Defendants' non-performance, misconduct or breach.

    112.   As a result of the Serpa Defendants' breaches, Plaintiffs have suffered, and

will continue to suffer, damages in an amount to be determined at trial.

## **EIGHTH CLAIM FOR RELIEF**

### **(Tortious Breach Of Duty Of Good Faith And Fair**

### **Dealing – By Plaintiffs Against The Serpa Defendants)**

    113.   Plaintiffs repeat, reallege and incorporate herein by reference each and every

allegation contained in the above paragraphs.

    114.   At all times mentioned herein, the Serpa Defendants had established a

confidential relationship of the utmost trust and confidence with Plaintiffs, and owed

Plaintiffs and its principals the duty of good faith and fair dealing.

    115.   The Serpa Defendants have breached their duty of good faith and fair dealing

by their actions and omissions as alleged herein.

116.    As a proximate result of the Serpa Defendants' breaches of the covenant of good faith and fair dealing, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined at trial.

117.    The Serpa Defendants did all of the acts alleged above with the intent to injure Plaintiffs and to unjustly enrich the Serpa Defendants at the expense of the Plaintiffs. The aforementioned acts were done willfully, maliciously and oppressively.  Accordingly, Plaintiffs request an award of exemplary and punitive damages against the Serpa Defendants, and each of them.

## NINTH CLAIM FOR RELIEF

### (Civil Conspiracy – By Plaintiffs Against The Serpa Defendants)

118.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in the above paragraphs.

119.    The Serpa Defendants and/or two or more of them conspired and agreed to accomplish an unlawful purpose and/or lawful purpose by unlawful means as alleged herein to harm Plaintiffs, including without limitation, conspiring and agreeing to cause the Serpa Defendants to breach fiduciary duties and commit fraud, and to cause the damage and injury to Plaintiffs as alleged herein.  Pursuant to the conspiracy, the Serpa Defendants committed the wrongs as alleged herein.

120.    As a result of the Serpa Defendants' conspiracy alleged herein, Plaintiffs are entitled to a declaration and judgment that:  (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the trust deed which secures the First Horizon Loan (the "First Horizon Trust Deed") is invalid and of no force and effect.

121.    As a result of the Serpa Defendants' conspiracy alleged herein, Plaintiffs are entitled to a declaration and judgment that the Friends Trust Deed is invalid and of no force and effect.

122.    As a proximate result of the Serpa Defendants' civil conspiracy, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined at trial.

123.    The Serpa Defendants entered into the conspiracy and took action pursuant thereto with the intent to injure Plaintiffs and to unjustly enrich the Serpa Defendants at the expense of the Plaintiffs.  The aforementioned acts were done willfully, maliciously and oppressively.  Accordingly, Plaintiffs request an award of exemplary and punitive damages against the Serpa Defendants, and each of them.

**TENTH CLAIM FOR RELIEF**

**(Declaratory Relief – By Plaintiffs Against NNTC)**

124.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in the above paragraphs.

125.    NNTC is the trustee under the First Horizon Trust Deed.  Plaintiffs claim and contend that: (i) NNTC is bound by a judgment in their favor herein that the First Horizon Trust Deed is of no force and effect, and (ii) NNTC is obligated to reconvey the First Horizon Trust Deed.  Plaintiffs allege on information and belief that NNTC disputes these contentions.

126.    Plaintiffs desire a judicial determination, declaration and judgment that (i) NNTC is bound by a judgment in Plaintiffs' favor herein that the First Horizon Trust Deed is of no force and effect, and (ii) NNTC is obligated to reconvey the First Horizon Trust Deed.  In addition, Plaintiffs seek this Court's order compelling NNTC to reconvey the First Horizon Trust Deed.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

**ON THE FIRST CLAIM FOR RELIEF:**

1.    For a judgment voiding the Friends Trust Deed pursuant to 11 U.S.C. §§ 544(a)(1), (2), and/or (3) and 550, and Nevada law, and preserving the lien created by the Friends Trust Deed for the benefit of CCR II's bankruptcy estate pursuant to 11 U.S.C. § 551.

**ON THE SECOND CLAIM FOR RELIEF:**

1.      For a declaration of rights and liabilities of Plaintiffs, the Serpa Defendants and NNTC as relating to CCT, CCR II and the Project, including the following declaration:

(a)      That the Serpas' rights and liabilities as relating to CCT and CCR II be determined in furtherance and in harmony with the joint purpose of those parties, as joint venturers, for the development of the Project;

(b)      For purposes of those rights and liabilities, the form of the Serpas' interest, including the Friends Note and Friends Trust Deed, be disregarded;

(c)      The Serpas and their affiliates including Sierra Clouds owe fiduciary duties to CCT, CCR II and the other Developer Entities in connection with the Project;

(d)      The Serpas are obligated to provide their share of all needed capital contributions for the Project;

(e)      The Serpas and CCT are to share profits generated from the Project as alleged herein;

(f)      The Serpas are obligated to perform the agreed-upon work and assist CCT as needed for their joint development of the Project;

(g)      The Serpas are under a duty not to record the Friends Trust Deed;

(h)      The Serpas are under a duty not to usurp opportunities of CCT, CCR II and the Developer Entities concerning the Project.

**ON THE THIRD CLAIM FOR RELIEF:**

1.      For a declaration and judgment that:  (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the trust deed which secures the First Horizon Loan is invalid and of no force and effect.

2.      For a declaration and judgment that the Friends Trust Deed is invalid and of no force and effect.

3.    For general damages against the Serpa Defendants, and each of them, in an amount to be determined at trial.

4.    For interest on all money damages at the legal maximum rate against the Serpa Defendants, and each of them.

5.    For punitive and exemplary damages against the Serpa Defendants, and each of them, in a sum sufficient to punish and make an example of the Serpa Defendants, and each of them.

**ON THE FOURTH CLAIM FOR RELIEF:**

1.    For a declaration and judgment that:  (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the First Horizon Trust Deed is invalid and of no force and effect.

2.    For general damages against the Serpa Defendants, and each of them, in an amount to be determined at trial.

3.    For interest on all money damages at the legal maximum rate against the Serpa Defendants, and each of them.

4.    For punitive and exemplary damages against the Serpa Defendants, and each of them, in a sum sufficient to punish and make an example of the Serpa Defendants, and each of them.

**ON THE FIFTH CLAIM FOR RELIEF:**

1.    For equitable subordination of the Serpa Defendants' Interests to (i) the claims of CCR II's unsecured creditors; and (ii) claims and interests of CCR II and CCT (and their constituent members) in the Project.

2.    For an order providing that any lien securing the Serpa Defendants' Interest be transferred to the bankruptcy estates of Plaintiffs as appropriate.

**ON THE SIXTH CLAIM FOR RELIEF:**

1.     For a declaration and judgment that:  (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the First Horizon Trust Deed is invalid and of no force and effect.

**ON THE SEVENTH CLAIM FOR RELIEF:**

1.     For general damages against the Serpa Defendants, and each of them, in an amount to be determined at trial.

2.     For interest on all money damages at the legal maximum rate.

**ON THE EIGHTH CLAIM FOR RELIEF:**

1.     For general damages against the Serpa Defendants, and each of them, in an amount to be determined at trial.

2.     For interest on all money damages at the legal maximum rate.

3.     For punitive and exemplary damages in a sum sufficient to punish and make an example of the Serpa Defendants, and each of them.

**ON THE NINTH CLAIM FOR RELIEF:**

1.     For a declaration and judgment that:  (i) the First Horizon Loan is deemed a capital contribution by the Serpas; (ii) the Serpa Defendants hold the First Horizon Loan as constructive trustees for CCR II; and (iii) the trust deed which secures the First Horizon Loan is invalid and of no force and effect.

2.     For a declaration and judgment that the Friends Trust Deed is invalid and of no force and effect.

3.     For general damages against the Serpa Defendants, and each of them, in an amount to be determined at trial.

4.     For interest on all money damages at the legal maximum rate.

5.     For punitive and exemplary damages against the Serpa Defendants, and each of them, in a sum sufficient to punish and make an example of the Serpa Defendants, and each of them.

**ON THE TENTH CLAIM FOR RELIEF:**

1.     For a declaration and judgment that:  (i) NNTC is bound by a judgment in Plaintiffs' favor herein that the First Horizon Trust Deed is of no force and effect, and (ii) NNTC is obligated to reconvey the First Horizon Trust Deed.

2.     For an order compelling NNTC to reconvey the First Horizon Trust Deed.

**ON ALL CLAIMS FOR RELIEF:**

1.     For attorneys' fees and other fees and costs, including expert witness fees, against the Serpa Defendants, and each of them, as provided by law.

2.     For costs of suit incurred herein against the Serpa Defendants, and each of them.

3.     For such other and further relief as the Court deems just and appropriate.

DATED:  July 26, 2011                    ALLEN MATKINS LECK GAMBLE
                                           MALLORY & NATSIS LLP

                                         AND

                                         LAW OFFICES OF AMY N. TIRRE, APC


                                         /s/ Amy N. Tirre, Esq.
                                         AMY N. TIRRE, ESQ.