VINCENT M. COSCINO (CA BAR NO. 122086)       E-Filed on August 31, 2011.
THOMAS E. GIBBS (CA BAR NO. 93819)
RICHARD M. DINETS (CA BAR NO. 265197)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
1900 Main Street, Fifth Floor
Irvine, California 92614-7321
Phone:  (949) 553-1313
Fax:  (949) 553-8354
E-Mail:  vcoscino@allenmatkins.com
       tgibbs@allenmatkins.com
       rdinets@allenmatkins.com

*[Proposed] Attorneys for Debtor and
Debtor in Possession*

AMY N. TIRRE (NV BAR NO. 6523)
LAW OFFICES OF AMY N. TIRRE
PROFESSIONAL CORPORATION
3715 Lakeside Drive, Suite A
Reno, Nevada 89509
Phone:  (775) 828-0909
Fax:  (775) 828-0914

*[Proposed] Attorneys for Debtor and
Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CLEAR CREEK RANCH II, LLC,<br>a Nevada limited liability company,<br><br>                Debtor. | Case No.: 11-52302<br><br>Chapter 11<br><br>**DEBTOR'S MOTION FOR ORDER AUTHORIZING REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**<br><br>Date:  September 28, 2011<br>Time:  10:00 a.m.<br>Est. Time Req'd: 10 minutes |

      Clear Creek Ranch II, LLC, a Nevada limited liability company ("CCR II" or the

"Debtor"), as debtor in possession, files this Motion for Order Authorizing Rejection of Executory

Contracts and Unexpired Leases (the "Motion"), and respectfully represents as follows:

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

936399.03/OC

## I.    JURISDICTION AND VENUE

The district court has jurisdiction over this matter under 28 U.S.C. § 1334.  This Court may hear this proceeding under Local Rule 1001(b)(1) and 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and 11 U.S.C. § 365.  The venue of the Debtor's chapter 11 case and this motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and Local Rules.

## II.    FACTUAL BACKGROUND

Clear Creek at Tahoe, LLC, a Nevada limited liability company ("CCT"), the debtor and debtor in possession in Case No. 11-52303, was formed in 2007 for the purpose of co-developing a multifaceted real estate project near Lake Tahoe (the "Project").  *See*, Declaration of James S. Taylor In Support of Debtor's Motion For Order Authorizing Rejection Of Executory Contracts and Unexpired Leases ("Taylor Decl."), ¶ 3, filed concurrently herewith.   Since then, the members of CCT have raised tens of millions of dollars, built a world class golf course, designed a residential community, and acquired the rights to a lake house on Lake Tahoe and a fly fishing ranch along the West Walker River for use as amenities for residents of the Project.[1] Id.

More specifically, the Project includes the following:

(a)    Residential Land.  CCT is the sole record owner of CCR II, which was formed in 2008 and owns the residential portion of the Project consisting of approximately 531 acres of real property entitled for the construction of 384 residential units – 221 estate homes on lots ranging from 1 to 5.48 acres and up to 163 cottages (the "Residential Subdivision").  Id. at ¶ 4.

(b)    Golf Course Land.  The parties created the Club at Clear Creek Tahoe, Inc. (the "Club") to take title to the golf course.  CCT is the sole record owner of the Club.  Id.

(c)    Open Space.  The rest of the Property is owned by CCR to be designated as open space by placing a conservation easement on that land.  CCT is the sole record owner of CCR.

While CCT is the sole record owner of CCR II, CCR and the Club (the "Developer Entities"), the true nature of CCR II and the other Developer Entities is that of a joint venture between CCT and John Serpa, Sr., his sons, Keith Serpa and John Serpa, Jr., and their affiliates

---

[1]    A full description of the Project can be found at http://www.clearcreektahoe.com /index.php. Taylor Decl. at ¶ 3.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

936399.03/OC

1  including a Serpa owned entity named Nevada Friends, LLC ("Friends") (collectively, the

2  "Serpas").[2]

3       Although the Club held legal title to the golf course land, CCR II developed and managed

4  the golf course.  As such, the creditors, employees and vendors of the golf course all looked to

5  CCR II for payment as the developer and operator.  Given this economic reality, and the conduct

6  of the parties, CCT and CCR II treated the golf course property as being owned by CCR II for tax

7  purposes.  The remaining assets, if any, and the liabilities related to the development and operation

8  of the golf course therefore appear on the schedules and statement of affairs of CCR II.  As such,

9  CCR II asserts it has the right and standing to reject executory contracts entered into by the Club.

10  The construction lender for the golf course, Textron Financial (also known as Dorfinco)

11  ("Textron"), asserts that it foreclosed its lien on the golf course land and the Club's personal

12  property on July 13, 2011.  Id. at ¶ 5.

13       On July 18, 2011 (the "Petition Date"), CCR II filed its voluntary petition for relief under

14  chapter 11 of the Bankruptcy Code (and so did CCT).  CCR II is continuing in possession of its

15  property and is operating and managing its business, as debtor in possession, pursuant to sections

16  1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner

17  has been made, and no creditors' committee has yet been appointed by the Office of the United

18  States Trustee.  Id. at ¶ 6.

19  **III.    RELIEF REQUESTED**

20       By this Motion, CCR II seeks entry of an Order rejecting as of the notice date of this

21  Motion, the following unexpired leases and executory contracts: (i) the Jonas Agreement; (ii) the

22  PNC Lease; (iii) the TCFEF Agreement; and (iv) the Textron Agreement (as such terms are

23  defined below).

24  **IV.    BASIS FOR RELIEF**

25       Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's

26  approval, may assume or reject any executory contract or unexpired lease of the debtor."

27

28  [2]    Also see, the adversary proceeding captioned Clear Creek Ranch II, LLC, et al. v. Nevada Friends, LLC, et al., Case No. 11-05075 filed on July 26, 2011 [Docket No.1].

11 U.S.C. § 365(a).  The test articulated by most courts for deciding whether to authorize rejection of a lease is simply whether rejection would benefit the estate, which is referred to as the "business judgment" test.  Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.), 476 F.3d 665, 670 (9th Cir. 2007); Lubrizol Enterprises v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043 (4th Cir. 1985); Control Data Corporation v. Zelman (In re Minges), 602 F.2d 38 (2nd Cir. 1979).  The rule as applied to a debtor's decision to reject a lease requires that the decision be accepted by court unless it is shown that the debtor's decision was one taken in bad faith or in gross abuse of business discretion.  In re Lubrizol, 756 F.2d at 1047; see also In re G Survivor Corp., 171 B.R. 755, 757-58 (Bankr. S.D.N.Y. 1994) (it is enough if, as a matter judgment, rejection of the contract may benefit the estate.)Courts recognize that the right of a debtor to reject contracts is fundamental to the bankruptcy process; it provides an important mechanism through which a debtor can be relieved of financially burdensome agreements while it attempts to reorganize.  See Navellier v. Sletten, 262 F.3d 923, 946 n.12 (9th Cir. 2001); FDIC v. Castetter, 184 F.3d 1040, 1043 (9th Cir. 1999); see also In re Chi-Feng Huang, 23 B.R. 798, 801 (9th Cir. B.A.P. 1982) ("The primary issue is whether rejection would benefit the general unsecured creditors.").

Here, prior to the Petition Date, CCR II and the Club were parties to various unexpired leases and executory contracts.  CCR II seeks to reject the contracts with the following third parties:

(a)    Jonas Software USA Inc.:  This agreement was entered into on or about March 17, 2009, by and between Jonas Software USA Inc., as Distributor, and the Club, as Customer (the "Jonas Agreement").  The Jonas Agreement provides for an original purchase price of $24,300 for the use of certain software, $6,075 for support and enhancement services, and $6,000 for training and installation services.  The Jonas Agreement provides for monthly payments of $757.81, plus applicable taxes, over a term of 48 months, for the use of the software, support and enhancement fees, and training and installation services.  As of the Petition Date, the outstanding balance remaining to be paid on the Jonas Agreement was $15,531.53.  The Jonas Agreement grants the Club a non-exclusive, non-transferable license to use various software programs associated with

1   the operation of the golf course.  Under the terms of the Jonas Agreement, title to the software

2   transfers to the Club at the conclusion of the Jonas Agreement term with no additional payment.

3   Taylor Decl. at ¶ 7.

4          CCR II takes the position that the portion of the Jonas Agreement requiring payment for

5   the use of the software creates a secured transaction, and not a true lease, because the Club's

6   obligations are for a term and is not subject to termination by the Club, the term of the Jonas

7   Agreement is equal to or greater than the remaining economic life of the software and title to the

8   software transfers to the Club at the conclusion of the Jonas Agreement term.  See Uniform

9   Commercial Code § 1-201(35) (definition of security interest); § 1-203 (factors that favor a

10  finding of security interest rather than lease).[3]  The nondebtor counterparty did not file a financing

11  statement, so the security interest is unperfected and avoidable by CCR II as debtor in possession.

12  See UCC § 9-317; 11 U.S.C. § 544.  Accordingly, the software which is the subject of the Jonas

13  Agreement is property of CCR II's bankruptcy estate and the agreement is not capable of being

14  assumed or assigned.  However, out of an abundance of caution, in the event the Court determines

15  the portion of the Jonas Agreement relating to the software use is a true lease, CCR II also seeks to

16  reject this portion of the Jonas Agreement.  Furthermore, the portion of the Jonas Agreement

17  requiring payment for support and enhancement services, and training and installation services, is

18  an executory contract, and should therefore be rejected.

19         (b)    PNC Equipment:  This lease was entered into on or about May 26, 2009, by and

20  between National City Golf Finance, a division of National City Commercial Capital Company,

21  LLC, as Lessor, and the Club, as Lessee (the "PNC Lease").  The PNC Lease provides for monthly

22  payments of $2,712.30, plus applicable taxes, over a term of 48 months, for the use of golf carts.

23  The Club provided a $20,000 security deposit at the time the PNC Lease was entered into.  There

24  is a fair market value buyout option for the golf carts at the conclusion of the PNC Lease term.

25  Id. at ¶ 8.

26

27

28

---

[3]    Although this citations are to the official "uniform" UCC, the enactments in the various states are not materially different.

(c)    <u>TCF Equipment Finance</u>:  This agreement was originally entered into on or about July 21, 2008, by and between Textron Financial and CCR II (the "Textron Agreement"), a portion of which was subsequently assigned by Textron Financial to TCF Equipment Finance ("TCFEF") on or about September 30, 2009 (the "TCFEF Agreement").  The TCFEF Agreement provides for monthly payments of $377.47, plus applicable taxes, over a term of 50 months, for the use of golf maintenance equipment.  As of the Petition Date, the outstanding balance remaining to be paid on the TCFEF Agreement was $8,755.34, consisting of $3,947.32 in past due accruals, and $4,808.02 remaining to be paid on the TCFEF Agreement.  To date, CCR II has paid $10,569.16 for the equipment listed on the TCFEF Agreement.  <u>Id.</u> at ¶ 9.

CCR II takes the position that the TCFEF Agreement creates a secured transaction, and not a true lease, because CCR II's obligations are for a term and is not subject to termination by CCR II, the term of the TCFEF Agreement is equal to or greater than the remaining economic life of the equipment, and title to the equipment transfers to CCR II at the conclusion of the TCFEF Agreement term.[4]  Accordingly, the equipment which is the subject of the TCFEF Agreement is property of CCR II's bankruptcy estate and the agreement is not capable of being assumed or assigned.  However, out of an abundance of caution, in the event the Court determines the TCFEF Agreement is a true lease, CCR II also seeks to reject the TCFEF Agreement.

(d)    <u>Textron Financial</u>:  The portion of Textron Agreement that was not assigned to TCFEF provides for varying monthly payments based on the four equipment lease schedules, over a term of 50 months, for the use of golf maintenance equipment.  The four equipment schedule numbers which are part of the unassigned portion of the Textron Agreement are:

(i)    Equipment Schedule No. 1027892: Monthly payments are $2,498.92, plus applicable taxes.  As of the Petition Date, the outstanding balance remaining to be paid on Equipment Schedule No. 1027892 was $80,948.80, consisting of $19,987.36 in past due accruals, $999.36 in finance charges, and $59,962.08 remaining to be paid on Equipment Schedule No.

---

[4]    See the true lease/secured transaction discussion on page 5.

1027892.  To date, CCR II has paid $69,955.76 for the equipment listed on Equipment Schedule No. 1027892.  Id. at ¶ 10.

(ii)    Equipment Schedule No. 1028125: Monthly payments are $913.17, plus applicable taxes.  As of the Petition Date, the outstanding balance remaining to be paid on Equipment Schedule No. 1028125 was $29,586.64, consisting of $7,305.36 in past due accruals, $365.20 in finance charges, and $21,916.08 remaining to be paid on Equipment Schedule No. 1028125.  To date, CCR II has paid $25,568.76 for the equipment listed on Equipment Schedule No. 1028125.  Id.

(iii)    Equipment Lease No. 1028327: Monthly payments are $1,050.28, plus applicable taxes.  As of the Petition Date, the outstanding balance remaining to be paid on Equipment Schedule No. 1028327 was $34,029.04, consisting of $8,402.24 in past due accruals, $420.08 in finance charges, and $25,206.72 remaining to be paid on Equipment Schedule No. 1028327.  To date, CCR II has paid $29,407.84 for the equipment listed on Equipment Schedule No. 1028327.  Id.

(iv)    Equipment Lease No. 1028712: Monthly payments are $557.77, plus applicable taxes.  As of the Petition Date, the outstanding balance remaining to be paid on Equipment Schedule No. 1028712 was $17,848.64, consisting of $4,462.16 in past due accruals, and $13,386.48 remaining to be paid on Equipment Schedule No. 1028712.  To date, CCR II has paid $15,617.56 for the equipment listed on Equipment Schedule No. 1028712.  Id.

CCR II takes the position that the unassigned portion of the Textron Agreement  creates a secured transaction, and not a true lease, because CCR II's obligations are for a term and is not subject to termination by CCR II, the term of the unassigned portion of the Textron Agreement is equal to or greater than the remaining economic life of the equipment, and title to the equipment transfers to CCR II at the conclusion of the Textron Agreement term.[5]  Accordingly, the equipment which is the subject of the unassigned portion of the Textron Agreement is property of CCR II's bankruptcy estate and the agreement is not capable of being assumed or assigned.

---

[5]    See the true lease/secured transaction discussion on page 5.

1  However, out of an abundance of caution, in the event the Court determines the unassigned

2  portion of the Textron Agreement is a true lease, CCR II also seeks to reject the unassigned

3  portion of the Textron Agreement.

4        As described above, the construction lender for the golf course, Textron, claims to have

5  foreclosed its lien on the golf course land and the Club's personal property on July 13, 2011, just

6  before CCR II filed its bankruptcy petition.  Thus, Textron claims that it now owns the golf course

7  land.  As part of its prepetition and ongoing restructuring efforts, CCR II has determined that

8  CCR II no longer receives a benefit from the unexpired leases and executory contracts described

9  above because they do not benefit the Residential Subdivision or the open space and due to

10 Textron's alleged foreclosure sale of the golf course.  Id. at ¶ 11.  Accordingly, CCR II has

11 determined that, in its business judgment, rejecting the unexpired leases and executory contracts

12 described above is in the best interests of the bankruptcy estate and the creditors thereof.

13 Id. at ¶ 12.

14                          **V.    CONCLUSION**

15       WHEREFORE, the Debtor respectfully requests that this Court grant the relief requested

16 herein, enter an Order rejecting the Jonas Agreement, the PNC Lease, the TCFEF Agreement, and

17 the Textron Agreement, to the extent any of them are true leases or executory contracts, all

18 effective as of the notice date of this Motion, and grant CCR II such other and further relief as is

19 just and proper.

20

21 Dated:  August 31, 2011                 ALLEN MATKINS LECK GAMBLE
                                              MALLORY & NATSIS LLP
22                                          Vincent M. Coscino (CA Bar No. 122086)
                                            Thomas E. Gibbs (CA Bar No. 93819)
23                                          Richard M. Dinets (CA Bar No. 265197)

24                                          and

25                                          LAW OFFICES OF AMY N. TIRRE

26                                          By:    /s Amy N. Tirre
                                              _____
27                                            Amy N. Tirre (Bar No. 6523)
                                              Proposed Counsel for the
28                                            Debtors and Debtors in Possession

### CERTIFICATE OF SERVICE

Pursuant to FRBP 7005 and FRCP 5(b), I certify that I am an employee of Law Offices of Amy N. Tirre, that I am over the age of 18 and not a party to the above-referenced case, and that on August 31, 2011 I filed and served **DEBTOR'S MOTION FOR ORDER AUTHORIZING REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** as indicated:

__X__          **BY NOTICE OF ELECTRONIC FILING**: through Electronic Case Filing System of the United States Bankruptcy Court, District of Nevada, to the individuals and/or entities at their email addresses as set forth below:

- U.S. TRUSTEE              USTPRegion17.RE.ECF@usdoj.gov
- STEPHEN R. HARRIS     steve@renolaw.biz, noticesbh&p@renolaw.biz
- BART K. LARSEN          blarsen@klnevada.com

_____          **BY HAND DELIVERY VIA COURIER**: by causing hand delivery of the Document listed above via Reno Carson Messenger Service to the persons at the addresses set forth below.

____          **BY MAIL**: by placing the document listed above in a sealed envelope with Postage thereon fully prepaid in the United States Mail at Reno, Nevada, and addressed as set forth below. I am readily familiar with my office's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on 31 August 2011, with postage thereon fully prepaid in the ordinary course of business.

DATED this August 31, 2011.

_____
          /s/ Andrea Black
An Employee of Law Offices of Amy N. Tirre